IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


KATHLEEN DYER, an individual,

        Plaintiff,

vs.

SOUTHWEST OREGON COMMUNITY
COLLEGE, a municipal corporation and
CODY YEAGER, personal capacity.

        Defendants.

Case No. 6:16-cv-02261-AA
**OPINION AND ORDER**

AIKEN, Judge:

In this wrongful discharge of employment case, plaintiff Kathleen Dyer sues Southwest

Oregon Community College ("SWOCC"), a municipal corporation, as well as Cody Yeager,

Dean of Career and Technical Education at SWOCC, in her personal capacity, alleging that

defendants violated 42 U.S.C. § 1983 when they terminated plaintiff's employment as a full-time

criminal justice instructor at SWOCC. Plaintiff avers that defendants (1) retaliated against her

for exercising her First Amendment free speech and free association rights, and (2) deprived her

of her Fourteenth Amendment property interest and right to due process, among other federal

and state law claims arising from the same nucleus of operative facts.[1] Plaintiff seeks a declaratory judgment that defendants violated her constitutional rights. She asks me to award equitable relief, damages, and attorney's fees.

Before me is defendants' motion for summary judgment as to plaintiff's § 1983 claims. For the reasons set forth herein, defendant's motion is denied in part, as to plaintiff's First Amendment retaliation claims, and granted in part, as to plaintiff's Fourteenth Amendment property interest violation claim.

## BACKGROUND

Plaintiff was initially hired by SWOCC on December 12, 2014, to serve as the college's sole full-time, tenure-track criminal justice instructor.[2] The Southwest Oregon Community College Federation of Teachers is the union which organizes and represents instructors at SWOCC. *See* Ds.' Ex. 6 at 4. As a SWOCC faculty member, plaintiff's employment contract was governed by the union's collective bargaining agreement with SWOCC. Under the terms of that agreement, all tenure-track appointments are classified as probationary for the first three consecutive years of employment. *Id.* at 28-29. "At the end of each annual contract the Employer reserves the sole right to renew the tenure track faculty member's contract for another year as it deems appropriate . . . ." *Id.* at 28.

---

[1] Plaintiff's remaining additional claims include sexual harassment and hostile work environment (Or. Rev. Stat. § 659A.030); sexual orientation discrimination (Or. Rev. Stat. § 659A.030); failure to accommodate plaintiff's disability (Or. Rev. Stat. § 659A.112 and 659A.118 - state), (42 U.S.C. § 12101, *et seq.* – federal); failure to engage in interactive process (Or. Rev. Stat. § 659A.112 – state), (42 U.S.C. § 12101, *et seq.* – federal); aiding or abetting (Or. Rev. Stat. § 659A.030). Plaintiff has agreed to dismiss additional § 1983 claims alleging violation of equal protection and violation of liberty interest.

[2] SWOCC employed other part-time, adjunct instructors within its criminal justice program; plaintiff was the only full-time, tenure-track instructor at the time that she was employed by SWOCC. Pl.'s Decl. Ex. 1 at 4.

Plaintiff began teaching college courses at SWOCC on January 2, 2015. Pl.'s 2d Am'd Compl. ¶ 19. In late June or early July of 2015, the former Dean of Career and Technical Education, plaintiff's supervisor, retired. Ds.' Ex. 1 at 5. That position was subsequently filled by Cody Yeager, a defendant in this action. Yeager's first day as Dean of Career and Technical Education was July 27, 2015. Pl.'s Ex. D at 4. On August 4, Yeager had an initial meeting with plaintiff and the exiting Dean. *Id.* On August 15, plaintiff hosted Yeager for dinner at plaintiff's home. *Id.* Plaintiff's husband and one other professional colleague were also present at the August 15 dinner. Plaintiff alleges several state law claims originating from comments by and interactions with Yeager at the August 15 dinner. *See* Pl.'s 2d Am'd Compl. ¶¶ 80-97. In or around September 2015, plaintiff filed complaints with SWOCC's human resources manager regarding alleged unwelcome sexual advances by Yeager. *Id.* at ¶ 31.

On September 1, 2015, plaintiff entered into a new contract with SWOCC for the 2015-2016 academic year. Pl.'s Ex. I. The dates of the contract spanned September 1, 2015 through June 10, 2016. *Id.* The contract classified plaintiff's appointment as "probationary, tenure track – first year." *Id.*

On October 6, 2015, plaintiff attended a monthly community criminal justice advisory meeting. Pl.'s Ex. H at 2. The so-called "chief's meetings" are monthly lunches attended by local law enforcement personnel, including the police chiefs of Coos Bay and surrounding communities. *See* Pl.'s Ex. H. Plaintiff had previously attended chief's meetings in January and June 2015, pursuant to expectations that she attend in her capacity as SWOCC's lead criminal justice instructor. *Id.* at 1. Plaintiff reported at deposition that she attended chief's meetings approximately twice a year: "I was required to." Pl.'s Ex. B at 9. Between September 28-29, 2015, plaintiff and Yeager exchanged emails regarding the nature of the chief's meetings and

confirming plaintiff's attendance at the October 6 meeting. *See* Pl.'s Ex. H. In that correspondence, Yeager expressed concern that an advisory committee to SWOCC's criminal justice program should include representation from across the criminal justice spectrum, rather than solely law enforcement. *Id.* at 2. Plaintiff responded via email that the chief's meetings are "a pretty comprehensive cross section." *Id.* However, in deposition, plaintiff explained that she and the prior Dean of Career and Technical Education had discussed how the chief's meetings were "too law enforcement oriented . . . . and that we would work on it." Pl.'s Ex. B at 9.

In January 2016, plaintiff's tenure committee conducted its first review of plaintiff. Pl.'s 2d Am'd Compl. ¶ 40. The committee recommended "retention without reservation."[3] *Id.*

On February 15, 2016, a SWOCC student then enrolled in one of plaintiff's courses approached plaintiff regarding criminal charges he was facing following an arrest. Pl.'s Ex. J at 1; Ds.' Ex. 5 at 1; *see also* Pl.'s 2d Am'd Compl. ¶ 53. Using her SWOCC office phone and while the student was present in plaintiff's office at SWOCC, plaintiff allegedly called her colleague, Paul Frasier, an adjunct criminal justice instructors at SWOCC and a local District Attorney. Pl.'s Ex. J at 1; Ds.' Ex. 5 at 1. Plaintiff states that she asked Frasier to look up the student's arraignment date, which Frasier agreed to do. Pl.'s 2d Am'd Compl. ¶ 54. The Notice of Termination letter from SWOCC to plaintiff states that plaintiff left a voice message for Frasier "asking him to look into it." Pl.'s Ex. J at 1; Ds.' Ex. 5 at 1.

Thereafter,[4] plaintiff reached out to Yeager to inquire about whether it would be appropriate for plaintiff to represent the student, pro bono, in the criminal matter. Pl.'s Ex C at

---

[3] Plaintiff's tenure committee's conclusion is set out in Plaintiff's Second Amended Complaint; the tenure committee report is not included in Plaintiff's Accompanying Declaration.

[4] Plaintiff's Second Amended Complaint states that plaintiff spoke with Yeager regarding the student requesting legal assistance the same day that plaintiff called Frasier about the matter. Pl.'s 2d Am'd Compl. ¶ 55.

3. Yeager reports that she responded that it would not be appropriate and would constitute a conflict of interest because "as a faculty member that would put her and the college in an adversarial relationship with the District Attorney's Office." *Id.* In deposition, Yeager further averred that she told plaintiff a conflict of interest would exist if plaintiff were to represent "[a]ny SWOCC student," not only students currently enrolled in plaintiff's courses. *Id.* at 3-4. Yeager told plaintiff that she would also check with the Vice President of Instruction. *Id.* at 3. Allegedly Vice President Ross Tomlin agreed with Yeager's assessment that plaintiff's representation of students would be a conflict of interest; Yeager says that she communicated Vice President Tomlin's opinion to plaintiff the same day that Yeager spoke with Tomlin regarding the matter. *Id.* at 4. Plaintiff declined to represent the student facing criminal charges who had requested plaintiff's assistance. Pl.'s 2d Am'd Compl. ¶ 59.

On March 8, 2016, Yeager issued a Notice of Performance Analysis to plaintiff via email on a day when plaintiff was out of the office. Ds.' Mot. Part. Summ. J. 4; Ds.' Ex. 1, 6. The Notice elaborated two counts of complaints against plaintiff: (1) use of foul language, and (2) plaintiff's telephone call to Frasier regarding the student who had come to plaintiff looking for help with navigating his criminal charges.[5] Ds.' Mot. Part. Summ. J. 4; Ds.' Ex. 1, 7. Allegedly Frasier had interpreted plaintiff's call regarding the student's arraignment date as "a request to intervene in his capacity as a District Attorney on behalf of a student[.]" Ds.' Mot. Part. Summ. J. 4. Plaintiff reports that she was very surprised by the occasion and content of the Notice:

---

[5] The Notice of Performance Analysis is not included in either parties' declarations or materials filed in association with this action.

"[T]here was no basis for it. I had never heard any of these allegations brought to me ever. No complaints, nothing. It was just pure speculation, and I was astounded."[6] Ds.' Ex. 1, 7.

On March 16 or 17, 2016, plaintiff met with Yeager and Human Resources Manager Matt Gilroy to discuss the Notice of Performance Analysis; the topic of representing students in legal matters arose during that meeting. Pl.'s Ex. C, 4; Pl.'s Ex. B, 5. HR Manager Gilroy "advised [plaintiff] not to represent any current students . . . . Students that are in her current classes." Pl.'s Ex A, 4. In deposition, Gilroy explained that SWOCC had a policy "concern about possible preferential treatment . . . giving those students something she wasn't providing other students[.]" *Id.* at 5. Gilroy confirmed that he would have permitted plaintiff to represent students who had been previously enrolled in her courses and students who might eventually enroll in plaintiff's courses. *Id.* at 6. Gilroy allegedly suggested the following three restrictions on plaintiff's prospective representation of SWOCC students: she could only provide such representation if she did so (1) pro bono, (2) on her own time, and (3) without utilizing SWOCC resources.[7] Pl.'s Ex. B, 5-6; Pl.'s 2d Am'd Compl. ¶ 56. Yeager was present at this meeting and does not appear to have contested Gilroy's directive.[8] Pl.'s Ex. B at 6. Plaintiff avers that no other SWOCC supervisor or administrator countered or withdrew Gilroy's directive to plaintiff regarding representation of students. P.'s 2d Am'd Compl. ¶ 58.

---

[6] A meeting was eventually scheduled for plaintiff to meet with SWOCC Vice President Ross Tomlin on June 8, 2016, to address the charges outlined in Yeager's administrative review, as contrasted with the plaintiff's positive tenure review; however, this meeting never occurred because plaintiff's employment was terminated on June 7, 2016, before the meeting with Tomlin could take place.

[7] Defendants deny the parameters allegedly set forth by HR Manager Gilroy. Ds.' Answer and Affirmative Defenses to Pl.'s 2d Am'd Compl. ¶ 56.

[8] Defendants deny that Yeager failed to express disagreement with the parameters allegedly set forth by HR Manager Gilroy. *Id.*

Sometime in late March or early April 2016, two of plaintiff's students came to class and explained to plaintiff, in the presence of attending classmates, that they and other SWOCC students had been arrested and charged as Minors in Possession ("MIP") while at a party at a private residence the previous weekend. P.'s Ex B at 2. The two students went on to explain that the circumstances of the arrest led them to believe the police had violated Fourth Amendment constitutional protections governing search and seizure.[9] *Id.* at 3-4. Plaintiff was clear with the two students enrolled in plaintiff's class that she would not represent them. *Id.* When the two students asked if she would represent other SWOCC students involved in the MIP incident, plaintiff reports that she responded, "If they approach me, I'll talk to them . . . . I don't know. It depends on their attitude. It depends." *Id.* at 4.

A day or two later, plaintiff was approached by a young man as she was getting in her car at SWOCC to go home after work. *Id.* at 4-5. The young man introduced himself as one of six SWOCC students not enrolled in plaintiff's course who had been arrested on MIP charges. *Id.* He asked if plaintiff would meet with them to discuss the case. *Id.* Plaintiff reports that she agreed to meet, but emphasized, "we're going to do it off campus and we're going to do it after work or on a Saturday afternoon," per the directive of HR Manager Gilroy. *Id.* at 5.

---

[9] According to the two students, police had come to the residence where the party was taking place, knocked on the door, and demanded entry. P.'s Ex B at 3. One of plaintiff's students had told the others not to open the door and to ask if the police had a warrant. *Id.* Allegedly the police responded, "No. Open the goddamn door." *Id.* The resident then denied the police entry and told them to get a warrant. *Id.* The police did not obtain a warrant; instead, the police officers surrounded the house, began knocking on the windows, and eventually broke down the door, forcing entry into the residence. *Id.* According to what the students told plaintiff, the police lined up the students and had them each blow into a breathalyzer. *Id.* at 12. The officer administering the breathalyzer verbally reported each blood alcohol content result to the transcribing officer and then issued a citation to the minor in question without actually showing the breathalyzer result to the cited individual. *Id.* Plaintiff reported in deposition that, "the students . . . all told me the same story separately. Very, very, very close stories." *Id.* at 11.

Plaintiff met with the six SWOCC students the following day at 5:30pm at Oak Street Park in North Bend, OR. *Id*; Ds.' Ex. 5, 1; Pl.'s Ex. J, 1. Plaintiff reports that she and the other six students were "huddled together" as they spoke. Ds.' Ex 1, 23. The two students enrolled in plaintiff's course, who had also been arrested and who had originally alerted plaintiff to the arrests, were also at the Park that evening, though they were "on the other end" of the picnic area such that plaintiff would have had to raise her voice "considerably" above "normal conversation tone" for them to hear. *Id*. at 23-24. Plaintiff reports, "I don't know what they heard because they never told me what they heard. But these were their friends and they all hung out together[.]" *Id*. at 24.

Plaintiff first appeared in court on behalf of the six SWOCC students not enrolled in her course on April 25, 2016. P.'s Ex. B at 5. Approximately five days before the case, plaintiff approached the judge presiding over the case in order to get the judge's input on whether a conflict of interest existed. *Id*. at 7. The judge allegedly found that plaintiff's representation of the students posed no conflict of interest. *Id*. Plaintiff explains "I thought she [the judge] was the appropriate person to make a determination as to whether or not there was a conflict of interest . . . . And she determined there was no conflict of interest so I went forward." *Id*.

On May 3, 2016, Paul Frasier, local District Attorney and adjunct SWOCC criminal justice instructor, sent an email titled "Dyer Investigation" to Yeager and Gilroy, regarding plaintiff's representation of the six SWOCC students who had been charged with MIPs. Ds.' Ex. 2. Frasier specifically detailed concerns expressed by the Coos Bay Police Captain regarding plaintiff' representation of the students: "He informed me that he felt it was a conflict for her to be in charge of the criminal justice program and then to be representing these students. He was not happy with Ms. Dyer's actions." *Id*. Frasier also stated in the email that the plaintiff had

previously contacted the Police Captain regarding to the case of the previous student, whom plaintiff had declined to represent. *Id.*

On May 11, 2016, Frasier submitted a memo to the file of the MIP cases removing himself from prosecution. Ds.' Ex. 3. The reason given in the memo for his removal was "to avoid any appearance of impropriety or conflict" in light of the fact that "the attorney for these defendants is Kathleen Dyer, who is my supervisor at SWOCC where I teach Criminal Justice classes . . . ."[10] *Id.* Frasier assigned a different prosecutor to the case. *Id.*

The SWOCC students' trial was held on May 19, 2016, in Coos County Circuit Court. Pl.'s Ex. 1 at 13. Plaintiff represented the six SWOCC students not enrolled in her course, whom she had met with at Oak Street Park. Pl.'s 2d Am'd Compl. ¶ 63; Ds.' Mot. Part. Summ. J. 5. At trial, plaintiff cross-examined the police officers who had arrested the students then on trial. P.'s Ex. B at 11. Plaintiff asked the police officers questions, including whether they had shown the results of the breathalyzer tests to the students who were arrested, whether those results could be corroborated, and why the police had entered the residence without a warrant. *Id.* at 12; Ds.' Mot. Part. Summ. J. 5. When one of the police officers responded by asking whether plaintiff was questioning the officer's integrity, plaintiff avers that she responded, "I'm questioning how you handled the case, yes." P.'s Ex. B 12.

The cases against the six SWOCC students whom plaintiff represented were dismissed due to Fourth Amendment violations. Pl.'s 2d Am'd Compl. ¶ 63. The two students then enrolled in plaintiff's course represented themselves pro se, and their cases were also

---

[10] In deposition associated with this action, SWOCC President Patricia Scott espoused the opinion that "it's inappropriate for her [plaintiff] to, in her position as criminal justice instructor, to represent students against another faculty member . . . . it's a direct conflict in my opinion." Pl.'s Ex. E at 9.

dismissed.[11]  *Id.* According to plaintiff, "the judge agreed with me that there was an egregious Fourth Amendment violation on all eight cases, and as a result of that[,] the fruit of the poisonous tree doctrine kicked in and all the charges were dismissed." Pl.'s Ex. B at 7-8.

On May 24, 2016, SWOCC President Patricia Scott had a meeting with the police chief and police captain "regarding Kate's [plaintiff's] behavior in the courtroom at that trial." Pl.'s Ex. E, 3. This meeting was scheduled by Frasier. *Id.*

On June 1, plaintiff attended a monthly chief's meeting. Prior to the chief's meeting, Yeager sent Frasier an email about the meeting in which she told Frasier that if he or the police chiefs felt they needed to "bar" plaintiff from the event, they "need not fear any interference from [Yeager] or SWOCC." Pl.'s Ex. C, 7-8. The plaintiff was not barred from the June 1 chief's meeting, and the meeting was quite tense. First, Frasier arrived to the meeting with the Assistant District Attorney who had prosecuted the MIP case. Ds.' Ex. 1, 14. Plaintiff indicated in deposition that the Assistant D.A.'s presence was unusual. *Id.* Furthermore, Yeager joined the meeting about halfway through, and Frasier, who seems to have been facilitating or running the meeting, called on Yeager to provide an update on SWOCC's criminal justice program, despite that plaintiff was listed on the agenda to give the SWOCC update. *Id.* at 15.

At the end of the meeting, plaintiff alleges that Frasier announced that he wanted to "address the elephant in the room . . . . [plaintiff's] behavior." *Id.* at 16; Pl.'s Ex. B, 10. According to plaintiff, Frasier then "lambasted" her for fifteen minutes regarding her representation of SWOCC students at the MIP trial, her purported conflict of interest, and how she had "embarrassed" police officers on the stand. *Id.* Apparently the Coos Bay police chief

---

[11] In deposition SWOCC President Patricia Scott noted her understanding that "there were 20 some [individuals] that got MIPs," and "those that chose for her to represent them got off and the others pled guilty." P.'s Ex. E, 9. This fact is not substantiated elsewhere in the record.

also critiqued plaintiff for calling the police officers' integrity into question, which plaintiff agreed she had done, saying, "It's called cross-examination." *Id.* Plaintiff reported in deposition that the critique lasted thirty minutes and she was "humiliated:" "it was a no win situation for me." Pl.'s Ex. B, 10-11; Ds.' 16-17. According to plaintiff, Frasier announced to the group that plaintiff's behavior had been such that it needed to be raised publicly. Pl.'s Ex. B, 15; Ds.' 20. "He made it really personal at that meeting." *Id.* Frasier concluded by telling plaintiff she was no longer invited to the chief's meetings. *Id.*

On June 3, plaintiff received a Notice of Investigatory Meeting from HR Director Gilroy, alerting plaintiff that SWOCC was considering dismissing her from her position. Ds.' Ex. 4. The Notice letter stated that "[t]he basis of this proposed action stems from the College's concerns regarding your violation of College directives and unprofessional conduct in violation of the College's Code of Conduct." *Id.* The letter further announced a "due process, pre-termination meeting" scheduled for June 7, which was purportedly intended to give plaintiff "an opportunity to present any information [she] want[ed] considered." *Id.*

On June 7, plaintiff attended the pre-termination hearing as scheduled. Pl.'s 2d Am'd Compl. ¶ 70. The only SWOCC administrator at the hearing was HR director Gilroy. *Id.* at ¶ 71. Yeager, SWOCC President Scott, SWOCC Vice President Tomlin, and Frasier were not present, thus plaintiff alleges she had no opportunity to confront the witnesses against her. *Id.* At or shortly after the hearing, HR Director Gilroy delivered to plaintiff a Notice of Termination, dated June 7, 2016. Pl.'s Ex J; Ds.' Ex. 5. The Notice of Termination stated, "During this meeting, you were given an opportunity to respond to the College's concerns. After carefully considering all of the issues and your responses, the College has determined that your conduct demonstrates a continued pattern of unprofessional conduct." *Id.* at 2. Plaintiff alleges that HR

Director Gilroy threw the Notice of Termination at her in front of students and SWOCC colleagues. Pl.'s 2d Am'd Compl. ¶ 72.

The Notice of Termination alleged two counts upon which plaintiff's termination was based. Pl.'s Ex J; Ds.' Ex. 5. First, the Notice alleged insubordination pertaining to plaintiff's representation of the six SWOCC students because two of plaintiff's then-current students were present when plaintiff gave the other six legal advice, which the Notice claimed "constituted [plaintiff] representing them" in violation of Yeager's instruction that she "not represent [her] current students." *Id.* Second, the Notice alleged plaintiff had engaged in unauthorized use of employment time and SWOCC resources when she called Frasier from her SWOCC office phone in February 2016 during work hours regarding the student who had approached her about legal representation, whom she declined to represent.[12] *Id.* Plaintiff challenges the reasons outlined by SWOCC in the Notice of Termination as "mere pretext" for her termination. Pl.'s 2d Am'd Compl. ¶ 74.

Plaintiff's employment contract with SWOCC was set to expire on June 10, 2016, three days after her employment was terminated. Because plaintiff's employment was terminated immediately prior to the administration of final exams for the courses she was then teaching,[13] SWOCC subsequently paid her beyond her final paycheck to grade her students' exams. Pl.'s Ex. A at 8.

It appears from the record that plaintiff filed a formal grievance regarding SWOCC's termination of her employment, pursuant to the terms of the teachers' Union agreement with

---

[12] The Notice also alleged that a similar call made by plaintiff to the Coos County Police Captain was also "inappropriate" because plaintiff worked with both Frasier and the Police Captain in her capacity as a SWOCC instructor.

[13] Plaintiff alleges that she was terminated just "minutes prior to when she was supposed to give one of her criminal justice classes its final exam. Another one of her classes had final exams two days later." Pl.'s 2d Am'd Compl. ¶ 75.

SWOCC. Ds.' Ex. 6 at 51-53. The parties appear to have participated in arbitration. Pl.'s Ex. B at 9; Ds.' Ex. 1 at 9, 16.

Plaintiff initially filed this action on December 2, 2016 (doc. 1) and filed a second amended complaint on August 23, 2017 (doc. 17). On September 28, 2017, defendants moved for partial summary judgment as to plaintiff's federal claims, all of which arise under 42 U.S.C. § 1983 (doc. 19). Plaintiff has agreed to voluntarily dismiss her § 1983 claims alleging violations of equal protection and liberty interest. Ds.' Mot. Part. Summ. J. 1. Plaintiff's remaining § 1983 claims entail defendant's alleged violations of plaintiff's First Amendment rights to free speech and free association, as well as her Fourteenth Amendment property interest right to due process.

## STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine issue of material fact. *Id.*; *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324. "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving parties favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008).

//

//

//

## DISCUSSION

Plaintiff brings her claims against defendants, alleging retaliation for and violation of her constitutional rights under 42 U.S.C. § 1983.[14] Defendants do not challenge that they acted under color of state law in terminating plaintiff's employment.

Defendants move for summary judgment as to plaintiff's First Amendment and Fourteenth Amendment claims, arguing that: (I) plaintiff's free speech and free association claims should be addressed as a hybrid claim; (II) plaintiff's contested speech and association activities did not pertain to matters of public concern, but even if they did, on balance SWOCC's legitimate administrative interests outweighed plaintiff's First Amendment rights; and (III) plaintiff did not have a reasonable expectation of continued employment, and thus she lacked a protected property interest meriting due process under the Fourteenth Amendment. I will address each of these arguments in turn.

### I. *First Amendment Hybrid Claim*

Defendants argue that I should conjunctively address plaintiff's freedom of speech and freedom of association retaliation claims. *See* Ds.' Mot. Part. Sum. J. at 7; Ds.' Reply at 2-3; Pl.'s 2d Am'd Complaint, 20-25. Defendants argue plaintiff's two First Amendment claims are sufficiently intertwined to merit the hybrid speech/association analysis set forth in *Hudson v. Craven*, 403 F.3d 691, 696-98 (9th Cir. 2005).[15] In *Hudson*, the court held that "[t]he speech and

---

[14] Section 1983 provides:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

[15] Similar to the instant case, *Hudson* involved a hybrid speech/association retaliation claim by a community college professor whose employment was terminated after she engaged in activities disapproved of by college administrators. Unlike the instant case, however, the

associational rights at issue here are so intertwined that we see no reason to distinguish this hybrid circumstance from a case involving only speech rights." *Id.* at 698. As a result, the court applied the free speech retaliation analysis set out by the U.S. Supreme Court to both of plaintiff's First Amendment claims. *Id.*

Following *Hudson*, the Ninth Circuit's hybrid analysis has been applied throughout the Circuit in cases where plaintiffs have pled both speech and association retaliation. *See Vizcarra v. Chou*, 2007 WL 4790813, *4 (C.D. Cal. 2007) (applying the hybrid analysis when plaintiff-employee alleged that defendants-employers retaliated against plaintiff due not only to plaintiff's own speech but also the speech of other employees with whom she associated and whose speech defendants may have attributed to plaintiff); *Schnabel v. Hualapai Valley First Dist.*, 2009 WL 322948, * 10 (D. Ariz. 2009) (applying the hybrid analysis when plaintiffs-employees' alleged that defendants-employers retaliated against plaintiffs due to statements made at Union meetings and information plaintiffs shared with the Union); *Biggs v. Town of Gilbert*, 2012 WL 94566, * 6 (D. Ariz. 2012) (applying the hybrid analysis when plaintiff-employee alleged defendants-employers retaliated against plaintiff due to plaintiff's retention of, and thus association with, legal counsel whom plaintiff hired to represent and speak for plaintiff regarding prospective adverse employment action). Indeed, it appears that courts within the Ninth Circuit apply the *Hudson*'s hybrid analysis virtually any time a plaintiff pleads both speech- and association-based retaliation claims. *See Murray v. Wash. St. Dep't of Ecology*, 2008 WL 467340, * 4 (E.D. Wash. 2008); *Godwin v. Rogue Valley Youth Corr. Facility*, 656 F.App'x 874, 875 (9th Cir. 2016); *Candelaria v. City of Tolleson*, 2017 Wl 6031769, * 1 n.1 (9th Cir. 2017); *cf. Hall v. Summit Fire Dist.*, 2018 WL 1576865, * 7 (D. Ariz. 2018) (finding the hybrid analysis inapplicable

---

activities engaged in by the *Hudson* plaintiff implicated student safety and substantive course material. 403 F.3d 691.

because plaintiff alleged solely associational retaliation and did not include a freestanding claim for violation of freedom of speech).

Plaintiff argues her speech and association retaliation claims are not inextricable and opposes applying the hybrid speech/association analysis to her First Amendment claims. Pl.'s Memo Oppo. Ds.' Mot. Part. Sum. J. at 3-4. Plaintiff seeks to distinguish her claim from that of the plaintiff in *Hudson*, which the District Court characterized as "more one involving freedom of association than freedom of speech." 403 F.3d at 695. Here, plaintiff argues that the speech and associational activities in which she engaged, and which led to the alleged retaliation by SWOCC, are separable; to wit, plaintiff avers that her speech claim pertains to her cross-examination of police officers at trial, while her association claim pertains to her representation of SWOCC students. Pl.'s Memo Oppo. Ds.' Mot. Part. Sum. J. at 3-4. Plaintiff further alleges that disputed issues of material fact separate plaintiff's speech and association claims.[16] *Id.*

While the activity engaged in by plaintiff is certainly factually distinguishable from the activity engaged in by the plaintiff in *Hudson*, here plaintiff's First Amendment claims are sufficiently intertwined to constitute a hybrid circumstance familiar from speech/association retaliation cases within the Ninth Circuit. Plaintiff's allegedly protected speech activity of cross-examining police officers at trial would not have occurred but for her association as pro bono legal defense counsel for the six SWOCC students. This does not negate that disputed issues of material fact remain regarding SWOCC's inconsistent policy as to legal representation of students by faculty, as well as SWOCC's purported justification(s) for terminating plaintiff's employment. However, those discrepancies do not override the fact that plaintiff's free speech

---

[16] Plaintiff points to inconsistent testimony given by employees of SWOCC in their representative capacities as to SWOCC's policy regarding legal representation of students by faculty, as well as inconsistency in the justifications reported for plaintiff's termination. *Id.* at 4.

and free association retaliation claims are so closely related that they should be evaluated as a single, hybrid First Amendment claim.

Plaintiff seems concerned that she may be disadvantaged in some way if the Court assesses her First Amendment claims as a single hybrid claim, presumably because defendants requested application of that analysis. Yet the hybrid approach serves simply to extend to free association claims the U.S. Supreme Court's public concern balancing test, articulated in *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968), for free speech claims in public employment settings. The *Pickering* balancing test states, "The problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* The *Pickering* analysis has been further fleshed out by the Ninth Circuit: *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009), sets forth the operative five-step analysis for First Amendment retaliation, of which the *Pickering* balancing test constitutes the fourth step. *Candelaria*, 2017 Wl 6031769, * 1 n.1.

[Maybe footnote this ¶?] The Tenth Circuit has noted that the public concern test for free speech originally arose from freedom of association cases. *Merrifield v. Bd. of Cty. Comm'rs for Cty. of Santa Fe*, 654 F.3d 1073, 1082 (10th Cir. 2011).[17] In *Merrifield*, the Tenth Circuit pointed out that the Supreme Court has applied the *Pickering* public concern test as the appropriate standard for First Amendment retaliation claims based on the Petition Clause. 654

---

[17] The court in *Merrifield* quoted the Supreme Court's analysis of *Pickering* in *Connick v. Myers*, 461 U.S. 138, 144-45 (1983):

> In . . . the precedents in which *Pickering* is rooted, the invalidated statutes and actions sought to suppress the rights of public employees to participate in public affairs. The issue was whether government employees could be prevented or "chilled" by the fear of discharge from joining political parties and other associations that certain public officials might find subversive.

F.3d at 1082, citing *McDonald v. Smith*, 472 U.S. 479, 105 (1985); *Borough of Duryea v. Guarnieri*, 563 U.S. 379, (2011). The Tenth Circuit drew from this case law "the Supreme Court's teaching that the 'political' First Amendment rights should be treated equally, at least in the government-employment context." *Merrifield*, 654 F.3d at 1082. The Tenth Circuit thus held that the Supreme Court would apply the public concern test to free association retaliation claims when a public employee-plaintiff claimed that "the government retaliated against an employee for associating with an attorney to speak or petition the government." *Id.* at 1083. The scenario in *Merrifield* is factually similar to this case, in which plaintiff alleges defendants terminated her employment at SWOCC in retaliation for speech and association she engaged in as an attorney.

Here, it makes sense to address plaintiff's retaliation claims as a single hybrid claim pursuant to *Hudson*, 403 F.3d at 691, because the political First Amendment rights at issue are intertwined, in a government-employment context. As such, I will apply the public concern balancing test articulated by the U.S. Supreme Court in *Pickering*, 391 U.S. at 568, and the First Amendment retaliation test fleshed out by the Ninth Circuit in *Eng*, 552 F.3d at 1070, to plaintiff's hybrid speech/association claim.

II.     *First Amendment Retaliation & Public Concern*

Defendants argue that they are entitled to summary judgment on plaintiff's claims that SWOCC unlawfully deprived her of her constitutional rights to free speech and free association when college administrators terminated her employment following her representation of SWOCC students in a criminal trial. Plaintiff argues that SWOCC terminated her in retaliation for her exercising those rights.

All Americans enjoy the rights to freedom of speech and association, which are codified and protected under the First Amendment of United States Constitution. U.S. Const. Am. I. The obligation to uphold these rights also extends to the states, pursuant to the Fourteenth Amendment. *Id.* at Am. XIV; *Gitlow v. New York*, 268 U.S. 651 (1925). When it comes to regulating the speech of public employees, however, the U.S. Supreme Court has acknowledged that a State's interests "differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). As noted above, the *Pickering* test sets forth that "The problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* The Ninth Circuit has definitively expressed that "[i]t is well-settled that the state may not abuse its position as an employer to stifle 'the First Amendment rights its employees would otherwise enjoy as citizens to comment on matters of public interest.'" *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009) (quoting *Pickering*, 391 U.S. at 568).

In determining whether a public employee has suffered retaliation for asserting her First Amendment right to free speech, courts evaluate the following:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Id.* A plaintiff bears the burden of demonstration at the first three steps of the inquiry; at step four, the burden shifts to the defendant. *Id.* at 1070-72. Steps one, two, and four are questions of law; steps three and five are questions of fact.[18] *Id.*

### 1. *Public Concern*

The concept of public concern figures centrally in determining whether a given article of speech falls within the scope of a public employee's protected speech and, by extension, protected association. The Supreme Court has held that topics of public concern are those "relating to any matter of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146 (1983). In ascertaining whether an employee's speech addresses a matter of public concern, *Connick* directs courts to examine the "content, form, and context of a statement, as revealed by the whole record."[19] *Id.* at 146-47. "[A] public concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at time of publication." *City of San Diego v. Roe*, 543 U.S. 77, 83-84 (2004).

The Ninth Circuit has "held that when government employees speak about corruption, wrongdoing, misconduct, wastefulness, or inefficiency by other government employees . . . their speech is inherently a matter of public concern." *Cabellos v. Garcetti*, 361 F.3d 1168, (9th Cir. 2004) (reversed on other grounds by *Garcetti v. Cabellos*, 547 U.S. 410 (2006) (noting in dicta, "Exposing governmental inefficiency and misconduct is a matter of considerable significance," *id.* at 425)). Moreover, "proceedings before a judicial or administrative body constitute matters of public concern if they bring to light potential or actual discrimination, corruption, or other

---

[18] The court in *Eng* noted that steps two and four, while ultimately legal questions, may entail resolution of underlying factual disputes. 552 F.3d at 1071.

[19] The protected status of speech is a question of law. *Connick*, 461 U.S. at 148 n.7.

wrongful conduct by government agencies or officials." *Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 925 (9th Cir. 2004) (further noting, "Litigation seeking to expose such wrongful governmental activity is, by its very nature, a matter of public concern," *id.* at 927). In contrast, statements about individual personnel disputes and grievances of no relevance to the public's evaluation of the performance of government agencies are generally not matters of public concern. *See McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983); *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003).

Here, plaintiff represented six SWOCC students in a criminal trial where an impartial County Circuit Court judge held that local police officers had violated Fourth Amendment protections against unlawful search and seizure. On this basis, the judge dismissed the charges against the defendants. Violation of constitutional protocols by local police officers fits cleanly within the definition of misconduct by government employees. In addition, plaintiff's speech and association at issue pertained directly to judicial proceedings that brought light to actual wrongful conduct by government officials, which an impartial adjudicator held had affirmatively occurred.

Defendants contend that plaintiff's speech did not constitute a matter of public concern for two reasons. First, defendants argue that plaintiff's speech was not intended to address police behavior in order to affect public perception of local law enforcement, but rather was merely plaintiff's strategic choice as a zealous advocate defending her clients. Ds.' Mot. Part. Summ. J. 9. This argument is unavailing. The Ninth Circuit has clearly stated that "[i]f some part of the communication addresses an issue of public concern, the First Amendment's protections are triggered even though other aspects of the communication do not qualify as a public concern." *Hyland v. Wonder*, 972 F.2d 1129, 1137 (9th Cir. 1992). Though plaintiff's speech was made in

a representative capacity while defending her clients, that context does not negate the nature of the topic as a matter of public concern. Here, the subject matter that plaintiff's speech pertained to—police misconduct—fits neatly within the parameters of the public concern test set forth in the case law.

Second and relatedly, defendants argue that plaintiff's speech did not constitute a matter of public concern because the contested speech was made in her capacity as an advocate rather than as a witness testifying to alleged wrongful governmental activity. Ds.' Reply 4. Defendants seek to distinguish plaintiff's case from *Alpha Energy Savers*, in which a plaintiff, who was not an attorney, alleged First Amendment retaliation after offering testimony as a witness against his public employer. 381 F.3d 917. However, defendants cite no rule or case law (and I have found none) indicating that speech made by public employee-attorneys which goes to matters of public concern is not protected by the First Amendment simply because the speech was made in a representative capacity.

Defendants cite *Gibson v. Office of the AG*, 561 F.3d 920 (9th Cir. 2009), for the general proposition that public employers may proscribe outside litigation by attorney-employees. However, the issue in *Gibson* pertained to a private legal malpractice lawsuit filed by the plaintiff-attorney on behalf of a client, which the Court held did not constitute a matter of public concern and therefore was not protected. *Id.* at 925-26. In contrast, the Ninth Circuit has held that a former assistant city attorney's civil lawsuit against her employer did constitute a matter of public concern when the suit alleged discriminatory hiring practices, political coercion, unequal treatment of persons in municipal criminal proceedings, and inappropriate remarks by a municipal court judge. *Rendish v. City of Tacoma*, 123 F.3d 1216, 1224 (9th Cir. 1997). Despite

that the plaintiff in *Rendish* had not yet proven the truth of her allegations, the Ninth Circuit held that "the allegations nonetheless do involve matters of public concern." *Id.*

Here, the criminal litigation that gave rise to plaintiff's challenged speech pertained to matters of public concern, including police misconduct and Fourth Amendment constitutional violations. The governmental misconduct in question was not merely speculative or alleged; an impartial county circuit court judge found that the misconduct had in fact occurred and dismissed underlying criminal charges on that basis. [Based on my reading of the record, the occasion of that misconduct was a primary motive for plaintiff to take on the case and represent the student-defendants pro bono.] Constitutional protection for speech regarding matters of public concern is not rendered inactive simply because the speech in question is made by an attorney in their representative capacity. *See Rendish*, 123 F.3d at 1224. I hold that plaintiff's speech and association as an attorney fell safely within the scope of public concern for purposes of First Amendment protection.

### 2. *Private Citizen or Public Employee*

The next step of the free speech retaliation analysis is assessing whether a plaintiff spoke as a private citizen or as a public employee. *Eng*, 552 F.3d at 1071; *see also Garcetti*, 547 U.S. at 421-22. "Statements are made in the speaker's capacity as a citizen if the speaker 'had no official duty' to make the questioned statements, or if the speech was not the product of 'performing the tasks the employee was paid to perform.'" *Posey v. Lake Pend Oreille School Dist. No. 84*, 546 F.3d 1121, 1126-27 (9th Cir. 2008) (quoting *Marable v. Nitchman*, 511 F.3d 924, 932-33 (9th Cir. 2007) and *Freitag v. Ayers*, 468 F.3d 528, 544 (9th Cir. 2006)). In *Garcetti*, the Supreme Court held that the plaintiff, a former District Attorney, had spoken in his employee capacity when he submitted a memo to his supervisor recommending dismissal of a

pending case because "his expressions were made pursuant to his duties as a calendar deputy." *Garcetti*, 547 U.S. at 421 ("We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline"). The Court contrasted the facts of *Garcetti* to the facts of *Pickering*, 391 U.S. 563, in which the plaintiff's speech consisted of a letter to a newspaper, which was of "no official significance." *Garcetti*, 547 U.S. at 422.

Here, it is clear that plaintiff's contested speech and association were not pursuant to her duties as an employee of SWOCC. To the contrary, defendants terminated plaintiff's employment expressly because she engaged in representation and speech beyond the scope of her employment, which defendants felt compromised SWOCC's relationship with the local law enforcement community. Plaintiff's association and speech, both in meeting with the student-clients at Oak Street Park and in cross-examining police officers at trial, were outside the purview of her role as a SWOCC instructor.

The orienting inquiry at this step is whether "an employee's expressions [were] made pursuant to official responsibilities." *Id.* at 424. Defendants may attempt to argue that plaintiff's phone calls to Paul Frasier and the police captain were made in her capacity as a SWOCC employee because those calls were allegedly placed from her SWOCC office phone during work hours. However, *Garcetti* makes clear that the fact that speech takes place inside the workplace is not dispositive of the speech being made in an employee capacity, even when the speech regards subject matter with which the employment is concerned. 547 U.S. at 420-21. In plaintiff's case, it is clear that her official responsibilities as a tenure-track SWOCC instructor

did not encompass her pro bono representation of SWOCC students. As such, plaintiff spoke and associated as a private citizen.

### 3. *Substantial or Motivating Factor*

The third step in the free speech retaliation analysis is assessing whether a plaintiff's protected speech was a "substantial or motivating factor in the adverse employment action." *Eng*, 552 F.3d at 1071. A plaintiff bears the burden of demonstrating sufficient evidence to determine this question of fact. *Id.*

Here, defendants freely concede that plaintiff was terminated due to her contested speech and association. The June 7, 2016, Notice of Termination specifically enumerates plaintiff's representation of SWOCC students and her calls to Frasier and the police captain as the bases for her dismissal. Pl.'s Ex. J; Ds.' Ex. 5. Furthermore, defendants' Reply Brief expressly states that plaintiff "was terminated because of having represented the students and the resulting damage to her relationship with local law enforcement." Ds.' Reply at 3. Plaintiff's free speech and free association retaliation claims are expressly cited by defendants as grounds for terminating plaintiff, constituting a substantial or motivating factor in the adverse employment action.

### 4. *Adequate Justification*

The fourth step is the heart of the First Amendment retaliation analysis and represents the *Pickering* balancing test in application. It is at this step that the burden shifts to an employer-defendant, and courts must determine whether the public employer had an adequate justification for treating the employee differently from other members of the public. *Eng*, 552 F.3d at 1071-72; *Garcetti*, 547 U.S. 418. That is, did the public employer's "legitimate administrative interests outweigh the employee's First Amendment rights"? *Thomas v. City of Beaverton*, 379 F.3d 802, 808 (9th Cir. 2004).

The Supreme Court has observed that, "The First Amendment limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens." *Garcetti*, 547 U.S. at 418. The Court has further explained that the value of public employees' expression reaches beyond the individual rights of a speaker, to the benefits that accrue to society at large when well-informed public employees participate in civic processes and dialogue. *Id.* at 419; *see also San Diego v. Roe*, 543 U.S. 77, 82 (2004) (stating, "The interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it"). Thus, it is the courts' "responsibility is to ensure that citizens are not deprived of fundamental rights by virtue of working for the government." *Connick*, 461 U.S. at 147.

At the same time, the Supreme Court has observed that public employers have a legitimate "interest in the effective and efficient fulfillment of its responsibilities to the public." *Connick*, 461 U.S. at 150 (noting, "'the Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs'" (quoting Justice Powell's concurrence in *Arnett v. Kennedy*, 416 U.S. 134, 168 (1974)); "When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate," *id.* at 151). Though "[a] government entity has broader discretion to restrict speech when it acts in its role as employer [than when it acts in its role as a sovereign] . . . the restriction it imposes must be directed at speech that has some potential to affect the entity's operations." *Garcetti*, 547 U.S. at 418. "So long as employees are speaking as citizens about an issue of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Id.*

The Ninth Circuit has articulated that "[a] state's burden in justifying a decision to discharge an employee varies depending upon the nature of the employee's expression." *Rendish*, 123 F.3d at 1224.

> Application of this balancing test entails a factual inquiry into such matters as whether the speech (i) impairs discipline or control by superiors, (ii) disrupts co-worker relations, (iii) erodes a close working relationship premised on personal loyalty and confidentiality, (iv) interferes with the speaker's performance of her or his duties, or (v) obstructs the routine operation of the office.

*Hyland*, 972 F.2d at 1139 (citations omitted). A disruption purportedly caused by an employee's speech must be "actual, material and substantial," not "imagined." *Id.* at 1140; *cf. Moran v. Washington*, 147 F.3d 839, 846 (9th Cir. 1998) (citing *Waters v. Churchill*, 511 U.S. 661 (1994), for the proposition that "'reasonable predictions of disruption' are sufficient" bases upon which public employers may remove employees). The Supreme Court has "caution[ed] that a stronger showing may be necessary if the employee's speech more substantially involved matters of public concern." *Connick*, 461 U.S. at 152.

Here, defendants contend that plaintiff's First Amendment rights were outweighed by SWOCC's interest in maintaining a cooperative relationship with the local criminal justice community. Ds.' Mot. Part. Summ. J. at 10. Defendants allege that "[p]laintiff's representation of students in a criminal matter disrupted a previously beneficial relationship between law enforcement and the College. As a result, she was no longer invited to attend the chief's meeting and the trust between the local agencies and the College's Criminal Justice program was put in jeopardy." *Id.* In response, plaintiff maintains that defendants overstate the importance of the chief's meetings to the administration of SWOCC's Criminal Justice Program, substantiated by the fact that plaintiff was expected to attend only twice per year. P.'s Memo at 6. Furthermore, plaintiff points out that she was disinvited from the chief's meetings at the suggestion of Yeager,

per the June 1, 2016 email that Yeager sent to Frasier indicating that if Frasier or the police chiefs felt they needed to bar plaintiff from the chief's meetings, they "need not fear any interference from [Yeager] or SWOCC." Pl.'s Ex. C, 7-8. It is thus unclear whether the local law enforcement community independently decided to disinvite plaintiff from the chief's meetings or whether that decision was made at the prompting of defendants.

*Pickering* alludes to "the kind of close working relationships for which it can be persuasively claimed that personal loyalty and confidence are proper to necessary functioning," the disruption or endangerment of which constitutes a sufficient basis for adverse employment action. 391 U.S. at 570. For these purposes, "close working relationships" appear to encompass primarily, if not exclusively, internal workplace relationships. *See e.g. Moran v. State of Wash.*, 147 F.3d 839 (9th Cir. 1998) (finding a State Insurance Commissioner's termination of a Deputy Commissioner justified when the Deputy Commissioner manifested insubordination toward the State Commissioner by continually resisting and refusing to engage in the program she had been hired to implement); *Richerson v. Beckon*, 337 Fed.Appx 637 (9th Cir. 2009) (affirming judgment for defendant-supervisor when plaintiff-employee, a curriculum specialist and instructional coach in a public school district "undermined her ability to enter into trusting relationships" with other school faculty by publishing thinly veiled, derisive comments about faculty members with whom she worked on a publicly accessible blog); *see also Castello v. City of Seattle*, 529 Fed.Appx 837 (9th Cir. 2013), and *Skaarup v. City of North Las Vegas*, 320 F.3d 1040 (9th Cir. 2009) (both cases finding dismissal of plaintiffs not protected when plaintiffs' alleged First Amendment activities targeted co-workers).

It appears unlikely that the existing line of case law regarding close working relationships in the public employment-First Amendment retaliation context extends to SWOCC's alleged

beneficial relationship with the local law enforcement community. SWOCC's relationship with local law enforcement was neither "essential to fulfilling public responsibilities," *Connick*, 461 U.S. at 151, nor "premised on loyalty and confidentiality" in the manner that internal workplace relationships require, *Hyland*, 972 F.2d at 1139.

Instead, defendants aver that SWOCC's interest in maintaining a positive relationship with members of the local law enforcement community was "crucial to the future employment for the College's Criminal Justice program graduates." Ds.' Reply, 6. However, it is not clear that the prospective employment of SWOCC students by local law enforcement institutions constitutes a legitimate administrative interest, given SWOCC's primary purpose of providing quality educational services and technical training in a wide variety of disciplines. [Cite SWOCC website?: www.socc.edu/about-us] Moreover, it is unclear whether SWOCC's purported relationship with the local law enforcement community was indeed necessary for student job placement, given the limited pool of qualified applicants in rural coastal Oregon.

Defendants cite *Hudson*, 403 F.3d 691, as an example of a public community college's legitimate administrative interests outweighing an instructor's hybrid speech and associational interests. The Ninth Circuit identified two legitimate administrative interests in *Hudson*: "the safety of students and pedagogical oversight." *Id.* at 699. The Court held that these administrative interests outweighed the plaintiff-employee's interest in participating in and encouraging her students to participate in a "de facto field trip" to the 1999 World Trade Organization protests in Seattle, and then including material from that event on the final exam.[20]

---

[20] As to the safety interest, the Court observed, "The potential for violence at the rallies was more than a wild card and the College was more than reasonable in being apprehensive . . . in the face of warnings about rioting." *Id.* at 700. As to the pedagogical oversight interest, the Court observed, "educational institutions have a strong pedagogical interest in avoiding institutional association with potentially divisive political issues." *Id.* at 701.

*Id.* at 700. The community college administrators in *Hudson* also expressed in advance their unequivocal disapproval of the plaintiff's proposed activity. *Id.* at 693-94.

Unlike the plaintiff in *Hudson,* here plaintiff's First Amendment activities never implicated or threatened to endanger the safety of students, a clear legitimate administrative interest. Neither does it appear that plaintiff's actions impinged on pedagogical oversight as did the plaintiff's in *Hudson,* since here plaintiff never made her contested speech/association activity a substantive part of her courses. Defendants may attempt to argue that, like the plaintiff in *Hudson,* plaintiff here involved SWOCC in potentially divisive political issues by inserting herself into a criminal matter and challenging the authority of local law enforcement, which SWOCC would have preferred to avoid. However, the nature of the potentially divisive political issue here (minor criminal charges and misconduct by local police officers) pales in comparison to the political nature of the issues in *Hudson* (violent street protests against globalization, neoliberalism, and world trade).

In addition, unlike the defendants in *Hudson,* SWOCC's policy regarding legal representation of students by staff and the communication of that policy to plaintiff was neither clear nor consistent, both at the time that the contested speech occurred and during deposition. In February or March of 2016, Yeager told plaintiff that it would not be appropriate for plaintiff to represent "*[a]ny* SWOCC student" and that doing so would "put her and the college in an adversarial relationship with the District Attorney's Office." Pl.'s Ex. C, 3, emphasis added. Allegedly SWOCC Vice President Tomlin concurred with Yeager's assessment. *Id.* at 4. Then, around March 16, 2016, HR Manager Gilroy "strongly advised" plaintiff "not to represent any *current* students . . . . Students that are in her current classes." Pl.'s Ex. A, 4, emphasis added. At deposition, Gilroy confirmed this directive and expressly clarified that he would have

permitted plaintiff to represent students who had previously enrolled in plaintiff's courses, as well as students who might eventually enroll in her courses. This describes the six students whom plaintiff represented at trial; plaintiff's two current students were excluded from the legal consultation plaintiff provided at Oak Street Park, though plaintiff's two current students were present elsewhere in the park. Plaintiff reports that Gilroy further stipulated that she could only represent SWOCC students if she did so pro bono, on her own time, and without using SWOCC resources; plaintiff adhered to all of these parameters.[21] Yeager was allegedly present when Gilroy issued these directives, and she did not question or challenge his instructions to plaintiff. Yeager and Gilroy's respective corporate depositions as designees of SWOCC are inconsistent as to SWOCC's policy regarding instructors' legal representation of students.[22] That policy, such as it was, is material to determining SWOCC's legitimate administrative interests.

Drawing all inferences in favor of plaintiff, the nonmoving party, I do not find that SWOCC's interests, as articulated, outweigh plaintiff's constitutional rights as a private citizen. SWOCC's beneficial relationship with local law enforcement did not rise to the level of a close working relationship as articulated in *Pickering* and illustrated in subsequent Ninth Circuit case law. Moreover, it is not summarily evident that SWOCC's interest in placing criminal justice program graduates in jobs with local law enforcement agencies constitutes a legitimate administrative interest. Even if job placement were found to be a legitimate administrative

---

[21] Incidentally, these guidelines all contribute to the finding at step two that plaintiff's contested speech was made in her capacity as a private citizen rather in her capacity as a public employee.

[22] SWOCC President Patricia Scott further testified in deposition that she thought it was "inappropriate for [plaintiff] to . . . represent students against another faculty member. . . . [I]t's a direct conflict in my opinion." Pl.'s Ex. E, 8. President Scott also suggested that in her estimation it might not be possible to distinguish time spent by a salaried faculty member in their personal capacity from time spent in their employment capacity, per HR Manager Gilroy's directive: "what is SWOCC time and what isn't, when you're a faculty member?" *Id*. at 8.

interest, it does not follow that plaintiff's exercise of her First Amendment rights at a single MIP criminal trial undermined the ability of current and future SWOCC graduates to obtain employment with local law enforcement. Finally, the record indicates that the disinvitation of plaintiff from the chief's meetings may have been at the prompting of Yeager herself, undermining on its face defendants' claim that plaintiff's speech and association activities alone disrupted the relationship between local law enforcement and SWOCC criminal justice program.

As such, I find that SWOCC did not have a legitimate administrative interest outweighing plaintiff's First Amendment rights to speak and associate as a private citizen on matters of public concern. It follows that SWOCC, as a public employer, lacked an adequate justification for treating plaintiff differently from other members of the public.

### 5. *But-For Causation*

When a public employer fails to demonstrate an adequate justification outweighing an employee's First Amendment rights, courts engage in the fifth and final step of the free speech retaliation analysis. *Eng*, 552 F.3d at 1072. The inquiry at this step is whether a public employer would have taken the adverse employment action against a plaintiff-employee even absent the protected speech; in other words, a public employer "may avoid liability by showing that the employee's protected speech was not a but-for cause of the adverse employment action." *Id.*, citing *Mt. Healthy City School Dist. Bd. of Educ. V. Doyle*, 429 U.S. 274 (1977). This determination is a question of fact. *Eng*, 552 F.3d at 1072.

The step-five inquiry is related to the inquiry at step three, which asks whether a plaintiff-employee's protected speech was a substantial or motivating factor in the adverse employment action. *Id.* The step-five inquiry is distinct in that a factfinder must determine whether the adverse employment action was also based on speech that was not protected and whether the

employer would have taken the same action based purely on that unprotected speech. *Id.* (citing *Knickerbocker v. City of Stockton*, 81 F.3d 907, 911 (9th Cir. 1996)).

Here, defendants do not allege that they would have terminated plaintiff's employment notwithstanding her representation of the six SWOCC students in the criminal trial. SWOCC's Notice of Termination cites both plaintiff's representation of SWOCC students and her alleged phone calls to Frasier and the police captain as grounds for her dismissal. Pl.'s Ex J; Ds.' Ex. 5. At step one, I found that plaintiff's pro bono representation of students who had been subject to an unlawful search fell within the scope of public concern. Even if plaintiff's February 2016 call to Frasier on behalf of the first student who sought her legal advice was found not to pertain to a matter of public concern, and thus was not protected speech, it is unlikely that that single phone call would have constituted an independently sufficient basis for her termination, especially lacking an initial warning and preliminary disciplinary action short of termination. Thus, given that plaintiff's protected speech pertaining to matters of public concern constituted a but-for cause of the adverse employment action taken against her, defendants have not met their burden of proof at step five of the free speech retaliation analysis.

In sum, because (1) plaintiff's speech and association activities pertained to a matter of public concern, (2) she spoke and associated as a private citizen, (3) her protected speech and association were express factors in SWOCC's termination of her employment, (4) SWOCC's interests as a public employer did not outweigh plaintiff's First Amendment rights, and (5) SWOCC would not have terminated plaintiff's employment absent her protected activity, I find defendants retaliated against plaintiff for engaging in speech and association that was protected under the First Amendment of the United States Constitution.

//

III.    *Fourteenth Amendment Due Process & Property Rights Deprivation*

Defendants argue that they are entitled to summary judgment on plaintiff's claim that SWOCC unlawfully violated her constitutional right to due process when college administrators terminated her employment. Plaintiff argues that she had a reasonable or legitimate expectation of continued employment at the time she was terminated, and thus a protected property interest which defendants unconstitutionally deprived her of by failing to provide sufficient due process prior to her termination.

The Fourteenth Amendment of the U.S. Constitution guarantees that no "State shall deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. Am. XIV, § 1. The right of procedural due process applies if a party is able to demonstrate a protected liberty or property interest at stake. *Board of Regents v. Roth*, 408 U.S. 564, 569 (1972). If a protected interest is established, then certain procedures are required before a public entity acting under the color of state law may deprive a party of the protected interest. *Goldberg v. Kelly*, 397 U.S. 254, 262-64 (1970); *Mathews v. Eldridge*, 424 U.S. 319, 332-34 (1976). "The fundamental requisite of due process is the opportunity to be heard," *Grannis v. Ordean*, 234 U.S. 385, 394 (1914), "at a meaningful time and in a meaningful manner," *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965).

Plaintiff alleges that she had a protected property interest in her job as a tenure-track SWOCC instructor at the time that her employment was terminated. "To have a property interest . . . a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Roth,* 408 U.S. at 577. A person's interest in his or her job can rise to the level of being a protected property interest, sufficient to merit a right to due process prior to deprivation of that

property interest. *See Perry v. Sinderman*, 408 U.S. 593, 601-03 (1972) (noting that "'property'

denotes a broad range of interests that are secured by 'existing rules or understandings,'"

(quoting *Roth*, 408 U.S. at 577). Academic tenure is paradigmatic of a protected property

interest in the employment context: "[a] written contract with an explicit tenure provision clearly

is evidence of a formal understanding that supports a teacher's claim of entitlement to continued

employment." *Id.* at 601. In *Sinderman*, the Court went still further, remanding on the basis that

a college instructor who had taught within a state college system for ten years could be entitled

to continued employment and due process protections, even absent an express conferral of

tenure, when the instructor had served longer than the established probationary period. *Id.* at

602-03. However, in *Roth*,[23] the Court found that an assistant professor who had completed one

year of teaching at a state university and subsequently was not rehired "did not have a property

interest sufficient to require the University authorities to give him a hearing," when a state statute

mandated that tenure could only be obtained after four years of year-to-year employment. 408

U.S. at 578. As a result, the plaintiff in *Roth* was not entitled to either continued employment

nor a due process hearing prior to nonrenewal of his contract. *Id.*

Here, plaintiff's employment contract at the time she was terminated expressly classified

plaintiff's employment as "probationary, tenure track – first year." Pl.'s Ex. I. Under the

collective bargaining agreement negotiated with SWOCC by the teachers' union (of which

plaintiff was a member), all tenure-track appointments are considered probationary for the first

three consecutive years of employment. Ds.' Ex. 6 at 4. Prior to entering into the operative

contract on September 1, 2015, plaintiff had served as a tenure-track instructor at SWOCC for

half of the prior academic year, January-June 2015, such that by June 2016, plaintiff had been

---

[23] *Roth* and *Perry* were decided by the Supreme Court on the same day: June 29, 1972.

employed continuously by SWOCC for one and a half academic years. Plaintiff's operative contract period ran through June 10, 2016. Pl.'s Ex. I. She received the Notice of Termination on June 7, 2016. Pl.'s Ex J; Ds.' Ex. 5.

Because plaintiff was a probationary employee whose term of employment with SWOCC was less than three years at time of termination, plaintiff concedes that she did not have a reasonable expectation of continuing employment beyond her contract end date. Pl.'s Memo in Oppo. to Ds.' Mot. for Part. Sum. J., 8. Defendants delivered the Notice of Termination to plaintiff three days before her contract was set to expire. I must thus decide whether the three days remaining in plaintiff's contract period at the time she was terminated constituted a protected property interest triggering the requirement of a due process hearing.

The timing and circumstances of a probationary employee's termination, as well as the terms of the employment contract, influence whether courts find employees possess protected property interests in their jobs such that a due process right is triggered. The Ninth Circuit has held that a public high school teacher under a probationary contract which ran for one academic year possessed "a property interest protectable under the due process clause" when he was terminated in March of the academic year. *Vanelli v. Reynolds Sch. Dist. No. 7*, 667 F.2d 773, 777 (9th Cir. 1982). The *Vanelli* Court stated that "[i]t is well established that an employee dismissed during the term of a one-year contract and in the breach of its provisions has a legitimate claim of entitlement and a property interest in continued employment." *Id.* Similarly, in *Matthews v. Harney Co., Or., Sch. Dist. No. 4*, 819 F.2d 889, 891 (9th Cir. 1987), the Ninth Circuit reiterated that "a mid-year dismissal of a probationary teacher under applicable Oregon law implicates a property interest protectible [sic] under the due process clause." Like the Court in *Vanelli*, the *Matthews* Court held that a public school teacher under a one-year contract had a

protectable property interest in her job when she was terminated in November of the relevant academic year.[24] *Id.* The Oregon Supreme Court has cooorespondingly held that a public school teacher, who was one month into a one-year probationary contract when he was terminated, had a protectible property interest. *Maddox v. Clackamas Cty. Sch. Dist. No. 25*, 293 Or. 27, 37 (1982). "Because plaintiff has a contract for a fixed term, and because he cannot be dismissed except in good faith, he has a property interest in employment for the remainder of his term of which he cannot be deprived without due process of law." *Id.*

However, *Godwin v. Rogue Valley Youth Corr. Facility*, 2013 WL 3712413, *3 (D. Or. 2013), pointed out that plaintiffs' contracts in *Maddox* and *Vanelli* "contained an explicit requirement that termination must be for good cause."[25] In contrast, the court found that the plaintiff in *Godwin*, a religious services coordinator at a juvenile correctional facility, did not have a protectable property interest in continued employment because the plaintiff's one-year contract stated that employment could be terminated by either party "for convenience." 2013 WL 3712413 at *3. "There is no protected property interest in an at will contract, even if the

_____

[24] In *Matthews*, the Ninth Circuit held that the informal notice and pre-termination meetings provided failed to afford the plaintiff sufficient due process, *id.* at 892, whereas the post-termination hearing provided in *Vanelli* "met the standards of fairness required by the due process clause." 667 F.2d at 780.

[25] The law that probationary teachers may only be terminated midyear on a "good faith" basis is mandated under Oregon's statute governing dismissal or nonrenewal of probationary teachers. Or. Rev. Stat. § 342.835(1) ("The district board of any fair dismissal district may discharge or remove any probationary teacher . . . at any time during a probationary period for any cause considered in good faith sufficient by the board"). The statute defines "teachers" as persons who hold teaching licenses or registration, or are "otherwise authorized to teach in the public schools of this state," and who are employed half-time or beyond as instructors. Or. Rev. Stat § 342.815(9). It is not clear whether SWOCC, a municipal corporation, would be considered a public school of this state for purposes of the Oregon statute. Notably, Oregon's statute is similar to the terms of the teachers union's collective bargaining agreement with SWOCC, insofar as Or. Rev. Stat § 342.815(3) defines "contract teachers" (in contrast to "probationary teachers," Or. Rev. Stat § 342.815(6)) as instructors who have been retained following three successive years of employment by a school district.

contract is for a fixed term." *Id*. Plaintiff's employment contract with SWOCC did not include a good cause or good faith dismissal requirement. *See* P.'s Ex. I; Ds.' Ex. 8. Article 17 of the teachers union's collective bargaining agreement with SWOCC stated that "[p]robationary . . . faculty . . . may be disciplined or discharged at any time at the discretion of the Employer." Ds.' Ex. 6, 35.

Furthermore, defendants cite *Papadopoulos v. Oregon State Bd. of Higher Educ.*, 14 Or App 130 (1973), for the rule that probationary teachers do not have a property interest in their jobs beyond the fixed term of a contract. "It is clear that at the end of the term of the contracts during the probationary period a teacher has no job security." *Id*. at 160. As a result, the plaintiff in *Papadopoulos*, a non-tenured professor at Oregon State University, "could have been discharged at the end of any of those years for any reason or no reason, and he would have no right to a hearing on the grounds for his discharge." *Id*. at 169-70. However, because the plaintiff's employment contract created an entitlement to continued employment through the end of the fixed term of the contract, "the Board was required by the constitution to accord [plaintiff] a hearing when it sought to discharge him before that date." *Id*. at 176-77. Subsequently the Oregon Supreme Court discussed *Papadopoulos* in *Maddox*, noting that when it comes to "nonrenewal of a probationary teacher's contract rather than dismissal during a fixed term contract[,] [t]he distinction is significant in determining whether a property interest exists." 293 Or. 39 n.9.

Applying the case law to the facts at hand, I find that plaintiff did not have a legitimate expectation of continued employment at SWOCC and thus lacked a protected property interest sufficient to trigger a due process right to a meaningful hearing prior to termination. To begin with, the terms of the teachers union's collective bargaining agreement with SWOCC expressly

stated that probationary faculty such as plaintiff may be "discharged at any time at the discretion of" SWOCC administrators. This contract language[26] resembles the contract in *Godwin*, which the court found did not accord a protected property interest because employment was effectively at will, despite that the contract established a fixed term. For this reason, plaintiff's employment at SWOCC during the probationary period was also at will, despite her status as a tenure-track community college instructor.[27]

In addition, the timing of defendants' termination of plaintiff's employment is significant in analyzing the scope of plaintiff's alleged property interest. It is well established that a probationary employee does not have a property interest in their job at the end of a contract period; mere nonrenewal of a probationary employee does not trigger a due process right. *See Papadopoulos*, 14 Or App at 169-70. Unlike the plaintiffs in *Vanelli, Matthews, Maddox*, and *Papadopoulos*, all of whom had multiple months remaining in their respective contract periods when they were terminated, here plaintiff was terminated just three days before her employment contract was set to expire. The decision to fire plaintiff 72 hours prior to the natural expiration of her contract may not have been a particularly prudent or efficacious decision on the part of SWOCC administrators, given that SWOCC was compelled to temporarily rehire plaintiff to grade the final exams for her courses. Nevertheless, the awkward timing of plaintiff's dismissal does not alter the fact that plaintiff had in effect reached the conclusion of her contract term when she received the Notice of Termination. I find the three days remaining in plaintiff's

---

[26] Plaintiff's employment contract with SWOCC stated that all of the union's collective bargaining agreement with SWOCC "shall apply to the contract and, by reference, is included as if fully set forth herein." P.'s Ex. I; Ds.' Ex. 8.

[27] Plaintiff's position as an instructor at a municipal community college also distinguishes her from the public school teacher plaintiffs in *Vanelli, Matthews*, and *Maddox*, whose property interests in their jobs, even during the probationary period, was statutorily protected under Oregon state law. *See* Or. Rev. Stat § 342.835(1).

contract period to be *de minimis*, falling short of the property interest necessary to trigger due process obligations. The at-will nature of plaintiff's employment contract with SWOCC further substantiates the finding that plaintiff lacked a protected property interest in her job with SWOCC at the time her employment was terminated.

In sum, plaintiff has not established that she had a reasonable or legitimate expectation of continued employment when she was terminated; thus, she lacked a protected property interest in her job at SWOCC. As a result, plaintiff's constitutional due process rights were not violated when SWOCC failed to provide a meaningful hearing prior to her termination.

## CONCLUSION

For the reasons set forth herein, defendant's motion for summary judgment is DENIED in part, as to plaintiff's First Amendment retaliation claims. Defendant's motion for summary judgment is GRANTED in part as to plaintiff's Fourteenth Amendment property interest violation claim and as to the two claims on which plaintiff concedes defendants are entitled to summary judgment.[28]

IT IS SO ORDERED.

Dated this 10 day of July 2018.

_Ann Aiken_
—————————————————
Ann Aiken
United States District Judge

---

[28] Plaintiff concedes defendants are entitled to summary judgment on plaintiff's claims alleging violation of the equal protection clause and violation of liberty interest. Ds.' Mot. for Part. Sum. J., 1; Pl.'s Memo. Oppo., 2.